BON v. FENLON.

(Supreme Court, Appellate Division, Second Department.   November 25, 1903.)

1. LANDLORD AND TENANT—TENANCY—EVIDENCE.
    Evidence in an action for rent *held* insufficient to support the finding
    that the tenant held over without a new contract of tenancy.

Appeal from Municipal Court, Borough of Brooklyn, Second District.

Action by Isadore M. Bon against John T. Fenlon.   From a judgment for plaintiff, defendant appeals.   Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HOOKER, JJ.

John V. Judge, for appellant.
Alvan R. Johnson, for respondent.

HOOKER, J.   This is an appeal from a judgment of the Municipal Court of the City of New York for the sum of $366.67, besides interest and costs, which is based upon rent claimed to be due from the defendant for the months of June, July, August, and September, 1902, at the rate of $91.67 per month.   On the 1st of November, 1900, the defendant entered into possession of an apartment on the fifth floor of an apartment house in the city of New York under a written lease for the term of 11 months ending September 30, 1901.   Late in the summer of 1901 the landlord submitted to the defendant two blank written leases for the term of one year, immediately following the termination of the tenancy under which he was then holding, with the request that they be signed by him.   This he refused to do.   Commencing in the spring of that year, and continuing for several months, the owners of a lot adjoining the apartment house in question on the side overlooked by the demised premises had commenced operations for the erection of a tall steel building, and defendant seems to have objected to the noise of the blasting and to the probability of his light and air being cut off when the erection of the new building should have been completed.   It is admitted that in August or September the authorized agent of the landlord had a conversation with the defendant, at which the wife of the latter was present, in which the matter of a lease for another year was discussed. So far the facts were undisputed, but the versions of this conversation are at variance.   The defendant insists that the legal effect of what was said between him and the agent at that time was to create another tenancy independent of the one for 11 months, which expired on the 30th day of September, 1901, while the plaintiff insists that it had no legal effect whatsoever, and that the defendant, by occupying the premises subsequent to the 30th day of September, became liable for the whole of another term similar to that of his first occupancy. The defendant remained in his apartments until the last of May, 1902, having paid the monthly rent in full up to that time.

The defendant testifies that he met the agent on the 16th or 18th of September, by appointment, in the reception room of the apartment house, when the latter asked him if he would sign the lease and

take the apartment for another year. Defendant spoke of the blasting, and the annoyance he had suffered by having steam come into his windows, and stated that, if the work was to be resumed, he would not stay there, and again undergo what he had experienced, and if the builders started the ironwork on the building about to be erected before the 1st of May following, he would move out in that month, but, 'if this iron construction was not commenced before the 1st of May, he would occupy and pay for the premises up to the 1st of October; and that the agent replied that such an arrangement would be satisfactory. This evidence is corroborated by the defendant's wife, and, as will be pointed out later, by correspondence which had taken place between the defendant and the general agents of the apartment house. The agent with whom this conversation was had, however, denies the statements made by the defendant concerning them. Although it is apparent that this witness and the defendant had in mind the same conversation between them, his evidence is vague, indefinite, and unsatisfactory as to the time it took place. He says he told the defendant they would like to have him renew for another year, but that they could not give him the privilege of vacating in the spring, and that they would talk that matter over with him when he signed his lease for another year. This witness also testifies on cross-examination that at the time of the conversation with the defendant he had a letter from Mr. Taylor, the then owner of the premises, to his employers, Slawson & Hobbs, from which he read to the defendant, to the effect that it was not expected that operations on the building in the rear of the apartment house would be continued during defendant's tenancy, thus corroborating the defendant's contention that he was contracting with reference to the change in the situation relative to the construction of the building in the rear of his apartment. This witness does not deny, nor is there any evidence in the case to dispute that of the defendant, that the owners of the premises in the rear of the apartment occupied by the defendant commenced further operations on the premises in the spring of 1902, and that the building was nearly completed at the time that the defendant vacated the apartment in question.

If the defendant occupied the premises without there having been created a new form of tenancy, it is, we think, true, as the trial court held, that he became liable for another term as a holdover, and that the trial court has held on the evidence we have quoted that the conversation between the agent and defendant was not sufficient to work any change in the tenancy. In doing so it was necessary for the court below to adopt the story of the agent. We believe, however, that the preponderance of evidence sustaining defendant's theory was so great as to require a verdict for him, and sufficient to call for a reversal here upon that ground. The defendant and his family had been annoyed by the building operations, and if they were to be continued it was inevitable that much of his light and circulation of air through the apartments would be cut off; and he urged these conditions upon the general agents for the building on two occasions. In July, 1901, in answer to a communication from them as to the re-renting of his apartment, he replied that he did not think he would

wish the apartment again, for the reason, among others, that the building going up in the rear would shut off his light and air. And again, on the 20th day of August in the same year, he wrote that he might take the apartment, but that the proposed building operations would influence him. It thus appears that during the whole of the summer of 1901 the burden of the defendant's objection about a re-renting was that he feared the building operations would interfere with his use and enjoyment of the premises, and we believe it far more natural under the circumstances that he should have made the agreement with the agent on the 16th of September, which he and his wife testified to, than that he should have assented to the suggestion made by the agent that the matter would be talked over by them after the defendant had signed a lease. He was a lawyer, and it was fair to assume that he must have been aware that any oral agreement varying the terms of the written lease would have been of no value to him, and would have been unavailing to relieve him on the 1st of May from his liability in case the building operations began again.

The numerical preponderance of evidence, coupled with the correspondence of the parties, considered in the light of all the circumstances, impel us to the belief that the judgment should be reversed as against the weight of evidence, and a new trial ordered, costs to abide the event. All concur, except BARTLETT, J., who concurs on the ground that the testimony of the landlord's agent shows that the question of the length of the tenancy was to remain open, so that the continued occupation by the tenant did not necessarily imply a renewal for a whole term.